﻿Citation Nr: AXXXXXXXX
Decision Date: 04/30/20 Archive Date: 04/30/20

DOCKET NO. 190627-15215
DATE: April 30, 2020

ORDER

Entitlement to service connection for bilateral hearing loss is denied.

Entitlement to service connection for bilateral hyperacusis is granted.

Entitlement to service connection for lumbosacral strain (claimed as low back condition) is denied.

Entitlement to service connection for left knee patellofemoral pain syndrome (claimed as a left knee condition) is denied.

Entitlement to service connection for right knee patellofemoral pain syndrome (claimed as a right knee condition) is denied.

REMANDED

Entitlement to service connection for pes cavus is remanded.

FINDINGS OF FACT

1. The Veteran does not have hearing loss that is considered a disability for VA benefits purposes.

2. The Veteran’s bilateral hyperacusis with vertigo had onset in service and continued after service.

3. The Veteran’s low back disability is diagnosed and medically explained as lumbosacral strain and lumbar osteoarthritis; it did not have onset in service, as manifested by chronic and continuous symptoms, during or soon after service; and it is not etiologically related to service. 

4. The Veteran’s left knee patellofemoral pain syndrome is a diagnosed and medically explained disorder; it did not become symptomatic or manifest during or soon after service; and it is not etiologically related to service. 

5. The Veteran’s right knee patellofemoral pain syndrome is a diagnosed and medically explained disorder; it did not become symptomatic or manifest during or soon after service; and it is not etiologically related to service.

CONCLUSIONS OF LAW

1.Bilateral hearing loss disability was not incurred in or aggravated by service. 38 U.S.C. §§ 1110, 1112, 1113, 5107 (2012); 38 C.F.R. §§ 3.303, 3.307, 3.309, 3.385 (2019).

2. Bilateral hyperacusis with vertigo was incurred in service. 38 U.S.C. §§ 1110, 5107; 38 C.F.R. § 3.303.

3. Lumbosacral strain (claimed as low back condition) was not incurred or aggravated in service, is not presumed to have had onset in service, and is not a qualifying chronic disability attributable to Persian Gulf service. 38 U.S.C. §§ 1110, 1112, 1113, 1117, 5107 (2012); 38 C.F.R. §§ 3.303, 3.307, 3.309, 3.317 (2019).

4. Left knee patellofemoral pain syndrome (claimed as a left knee condition) was not incurred or aggravated in service, is not presumed to have had onset in service, and is not a qualifying chronic disability attributable to Persian Gulf service. 38 U.S.C. §§ 1110, 1112, 1113, 1117, 5107; 38 C.F.R. §§ 3.303, 3.307, 3.309, 3.317.

5. Right knee patellofemoral pain syndrome (claimed as a left knee condition) was not incurred or aggravated in service, is not presumed to have had onset in service, and is not a qualifying chronic disability attributable to Persian Gulf service. 38 U.S.C. §§ 1110, 1112, 1113, 1117, 5107; 38 C.F.R. §§ 3.303, 3.307, 3.309, 3.317.

REASONS AND BASES FOR FINDINGS AND CONCLUSIONS

The Veteran served on active duty from May 2002 to May 2006. That service included periods of service in Kuwait and Iraq. He had deployments from February to May 2003 and from August to December 2004.

This matter comes before the Board of Veterans’ Appeals (Board) on appeal from an August 2018 rating decision issued by a Department of Veterans Affairs (VA) Regional Office (RO).

On August 23, 2017, the President signed into law the Veterans Appeals Improvement and Modernization Act, Pub. L. No. 115-55, also known as the Appeals Modernization Act (AMA). This law creates a new framework for veterans dissatisfied with VA’s decision on their claim to seek review. This decision has been written consistent with the new AMA framework.

In appealing the August 2018 rating decision, the Veteran elected the “evidence” process. He submitted additional evidence within 90 days after his May 2019 notice of disagreement (NOD).

1. Service connection for bilateral hearing loss

The Veteran contends that noise exposure in service caused bilateral hearing loss. His service records contain notations that he was routinely exposed to noise. He also sought, and a Department of Veterans Affairs (VA) Regional Office (RO) granted, service connection for tinnitus.

Service connection may be established on a direct basis for a disability resulting from disease or injury incurred in or aggravated by active service. 38 U.S.C. § 1110; 38 C.F.R. § 3.303. Service connection may also be granted for any disease diagnosed after service when all the evidence establishes that the disease was incurred in service. 38 C.F.R. § 3.303(d). In general, service connection requires (1) evidence of a current disability; (2) medical evidence, or in certain circumstances lay evidence, of in-service incurrence or aggravation of a disease or injury; and (3) evidence of a nexus between the claimed in-service disease or injury and the current disability. See Shedden v. Principi, 381 F.3d 1163, 1167 (Fed. Cir. 2004).

Service connection for certain chronic diseases, including organic diseases of the nervous system, may be established based upon a legal presumption by showing that the disease manifested itself to a degree of 10 percent disabling or more within one year from the date of discharge from service. 38 U.S.C. § 1112; 38 C.F.R. §§ 3.307, 3.309.

Service connection may be granted on a secondary basis for a disability that is proximately due to or the result of a service-connected disease or injury. 38 C.F.R. § 3.310(a). Aggravation of a non-service-connected disease or injury by a service-connected disability may also be service-connected. 38 C.F.R. § 3.310(b).

For VA disability benefits purposes, impaired hearing is considered a disability when the auditory threshold for any of the frequencies of 500, 1000, 2000, 3000, and 4000 Hertz is 40 decibels or greater; the auditory thresholds for at least three of these frequencies are 26 decibels or greater; or speech recognition scores using the Maryland CNC Test are less than 94 percent. 38 C.F.R. § 3.385. The United States Court of Appeals for Veterans Claims (Court) has held that 38 C.F.R. § 3.385 does not preclude service connection for current hearing disability where hearing was within normal audiometric testing limits at separation from service. See Hensley v. Brown, 5 Vet. App. 155, 159 (1993). The Court explained that, when audiometric test results do not meet the regulatory requirements for establishing a “disability” at the time of a veteran’s separation, the veteran may nevertheless establish service connection for a current hearing disability by submitting competent evidence that the current disability is causally related to service. In addition, the Court cited a 1988 medical treatise that stated that the threshold for normal hearing was from 0 to 20 decibels, and that higher threshold levels indicate some degree of hearing loss.

The Veteran served in the Southwest Asia theater of operations after August 2, 1990, so during the Persian Gulf War. See 38 C.F.R. § 3.2(i). Therefore, he is a Persian Gulf veteran. Service connection may be established for a Persian Gulf veteran who has a qualifying chronic disability that became manifest during service or to a degree of 10 percent or more not later than December 31, 2021. 38 U.S.C. § 1117; 38 C.F.R. § 3.317.

A “qualifying chronic disability” includes: (A) an undiagnosed illness, (B) a medically unexplained chronic multisymptom illness, such as chronic fatigue syndrome, fibromyalgia, and functional gastrointestinal disorders (excluding structural gastrointestinal disease), or (C) any of the infectious diseases, listed at 38 C.F.R. § 3.317(c)(2), that VA has determined is presumed to be service connected in Persian Gulf veterans. 38 U.S.C. § 1117(a)(2); 38 C.F.R. § 3.317(a)(2)(i).

The term “medically unexplained chronic multisymptom illness” means a diagnosed illness without conclusive pathophysiology or etiology, that is characterized by overlapping symptoms and signs and has features such as fatigue, pain, disability out of proportion to physical findings, and inconsistent demonstration of laboratory abnormalities. Chronic multisymptom illnesses of partially understood etiology and pathophysiology, such as diabetes and multiple sclerosis, will not be considered medically unexplained. 38 C.F.R. § 3.317(a)(2)(ii).

Disabilities that have existed for six months or more, and disabilities that exhibit intermittent episodes of improvement and worsening over a six-month period, will be considered chronic. 38 C.F.R. § 3.317(a)(4). A qualifying chronic disability shall be considered service connected. 38 C.F.R. § 3.317(a)(6). Compensation shall not be paid for a qualifying chronic disability if there is affirmative evidence that the disability was caused by a supervening condition or event that occurred between the veteran’s most recent Southwest Asia duty and the onset of the disability. 38 C.F.R. § 3.317(a)(7)(ii).

Signs or symptoms which may be manifestations of undiagnosed illness or medically unexplained chronic multisymptom illness include, but are not limited to: (1) fatigue, (2) signs or symptoms involving skin, (3) headache, (4) muscle pain, (5) joint pain, (6) neurological signs or symptoms, (7) neuropsychological signs or symptoms, (8) signs or symptoms involving the upper or lower respiratory system, (9) sleep disturbances, (10) gastrointestinal signs or symptoms, (11) cardiovascular signs or symptoms, (12) abnormal weight loss, or (13) menstrual disorders. 38 C.F.R. § 3.317(b).

The Board of Veterans’ Appeals (Board) must assess the credibility and weight of all the evidence, including the medical evidence, to determine its probative value, accounting for evidence which it finds to be persuasive or unpersuasive, and providing reasons for rejecting any evidence favorable to the claimant. See Masors v. Derwinski, 2 Vet. App. 181 (1992); Wilson v. Derwinski, 2 Vet. App. 614, 618 (1992); Hatlestad v. Derwinski, 1 Vet. App. 164 (1991); Gilbert v. Derwinski, 1 Vet. App. 49 (1990). Equal weight is not accorded to each piece of evidence contained in the record; every item of evidence does not have the same probative value. When there is an approximate balance of positive and negative evidence regarding any issue material to the determination of a claim, VA shall give the benefit of the doubt to the claimant. 38 U.S.C. § 5107. To deny a claim on its merits, the evidence must preponderate against the claim. Alemany v. Brown, 9 Vet. App. 518, 519 (1996), citing Gilbert, 1 Vet. App. at 54.

The Veteran’s hearing was tested at entrance to service, during service, and at separation from service. On that testing, in each ear, the auditory thresholds at the frequencies of 500, 1000, 2000, 3000, and 4000 Hertz were all 15 decibels or lower. Most of the testing reports did not include speech recognition scores. On word recognition testing in September 2003 the scores were 100 percent in each ear.

The Veteran had VA medical treatment within a year after his separation from service. Notes of treatment in 2006 and 2007 indicated that he had no hearing loss. In treatment visits through May 2018 he did not report difficulty hearing.

In May 2018 the Veteran sought service connection for hearing loss. On VA examination in June 2018, in each ear, the auditory thresholds at the frequencies of 500, 1000, 2000, 3000, and 4000 Hertz were all 15 decibels or lower. Speech recognition scores were 100 percent in each ear. The examiner found that hearing in each ear was normal. The examiner reviewed the Veteran’s claims file. The examiner found that neither ear had significant changes in hearing thresholds in service.

The Veteran had noise exposure in service, but did not have hearing loss on testing in service. His hearing thresholds did not have significant changes in service. He did not have disabling hearing loss soon after service, and current testing has not shown hearing levels that are considered impaired hearing for VA disability benefits purposes. The Board denies service connection for hearing loss.

2. Service connection for bilateral hyperacusis with vertigo

The Veteran contends that bilateral hyperacusis and vertigo began in service and continued after service. As noted above, an RO established service connection for the Veteran’s tinnitus.

During service, in a sick call visit in October 2002, the Veteran reported ear pain, with onset a few months earlier, in boot camp. A clinician observed erythema in both external canals. The clinician’s assessment was bilateral external otitis. The clinician prescribed Corticosporin ear drops.

In January 2003 the Veteran had another sick call visit to address ear pain. He stated that since boot camp he had pain in both ears, worse in the left. He related that the pain increased substantially with noise. The clinician noted the October 2002 diagnosis of otitis externa. The clinician indicated suspecting an inner ear abnormality.

In a post-deployment assessment in May 2003, the Veteran marked no for dizziness presently or during his February to May 2003 deployment.

In a sick call visit in July 2003, the Veteran reported that with loud noises he had sharp pain in both ears. He stated that the pain took time to decrease. He related having experienced those symptoms since boot camp in 2002. Clinicians provided assessments of ear pain with loud noise, and hyperacusis.

The Veteran had an otolaryngology consultation in August 2003 to address hyperacusis. He reported a one-year history of bilateral tinnitus, primarily with exertion. He denied vertigo or otalgia. The otolaryngologist found that his tympanic membranes appeared normal. In a September 2003 audiological evaluation, the Veteran reported otalgia of 9 out of 10 severity. He stated that with loud sounds he had left ear pain and a broken speaker sound in that ear. He denied vertigo. On testing he had normal hearing sensitivity. 

Later in September 2003 the Veteran had an otolaryngology consultation to obtain a second opinion regarding left ear pain. He reported that for one and a half years he had intermittently experienced sharp pain associated with sound. He stated that he also occasionally had those symptoms in his right ear. He denied vertigo. The clinician noted mild tenderness of the left temporomandibular joint (TMJ). She stated that the otalgia was of unclear etiology. She indicated that she suspected a TMJ disorder. 

In October 2003 the Veteran had a CT scan of his temporal bones. His temporal bones appeared unremarkable and his middle ears, mastoid air cells, and internal auditory canals appeared normal. Later in October 2003 he had another otolaryngology consultation, to address left otalgia of unclear etiology. The physician noted the normal CT scan findings. The physician’s listed an impression was left otalgia and hearing sensitivity, without offering further statements as to etiology.

In a post-deployment health assessment in November 2004, the Veteran marked no for dizziness presently or during his August to December 2004 deployment. In a May 2005 medical history, the Veteran marked no for history of ear trouble and dizziness. In a June 2005 screening, a clinician found that the Veteran was fit for overseas duty. 

After the Veteran’s separation from service, he had VA primary care in 2006 to 2009 and in 2016 to 2018. In January 2016 it was noted that there was no ear pain and no vertigo. Other treatment notes did not contain any reports of ear pain, ear sensitivity, or significant vertigo.

The Veteran had a VA audiology examination in June 2018. He related exposure to noise, including yelling by drill instructors, from boot camp forward. He reported that in boot camp he began to experience pain in both ears, worse in the left. He indicated that the symptoms continued through the present. He stated that when he whistled, he experienced pain in both ears, beginning in the left. He indicated that with loud noises he experienced a sound like a broken speaker. He related with movement or change of position he had easy onset of dizziness and off-balance sensations.

In August 2018, a VA primary care physician reviewed the Veteran’s claims file. The physician expressed the opinion that it is less likely than not that the Veteran’s current hyperacusis with vertigo was incurred in service. In explanation, she noted that during service, in 2002 and 2003, the Veteran reported ear pain and sensitivity and he did not report vertigo. She found that he did not report hyperacusis or vertigo on post-deployment assessments, nor in VA treatment after service. She concluded that records did not show continuity throughout service and after service of the symptoms reported in 2002 and 2003.

In May 2019 the Veteran’s wife wrote that during service the Veteran began to have ear problems, including extreme sensitivity to loud noises. She stated that presently he continued to have ear problems, including a blown speaker sound, ringing, and pain in response to loud noises. She asserted that he had vertigo as a result of the ear problems that began in service.

In May 2019 private physician A. M. G., D.O., reviewed the Veteran’s medical records from during and after service, and completed a nexus statement. Dr. G. indicated that several of the Veteran’s current disorders, including vertigo secondary to hyperacusis, were caused by the demanding physical nature of his military service.

In June 2019 the Veteran wrote that pain in both of his ears began in boot camp and worsened after his 2003 deployment. He noted that diagnoses in service included hyperacusis. He stated that in service he had numerous medical consultations, but the issue did not resolve. He reported that, through the present, sounds sometimes brought on ear pain and a blown speaker sound. He stated that, when those symptoms are severe, he cannot listen to sounds around him. He said that, when asked during service, he did not endorse having vertigo because he did not understand what vertigo was. He stated that presently he had occasional vertigo, which he asserted is related to his hyperacusis.

In June 2019 the Veteran submitted a 2015 internet article on hyperacusis from the American Speech-Language-Hearing Association. The article indicates that exposure to single or repeated loud noises is a major cause of hyperacusis.

During the Veteran’s service he made numerous reports of episodes of ear pain and sensitivity from boot camp forward. Those accounts are fairly consistent. Although he did not seek VA treatment for those symptoms, his statements that the symptoms continued after service are credible and reasonably convincing. Resolving reasonable doubt in his favor, the Board grants service connection for his hyperacusis with vertigo given the positive medical opinion from the Veteran’s private physician and given the Veteran’s credible account of continuity of symptoms since service.

3. Service connection for lumbosacral strain (claimed as low back condition)

The Veteran contends that current low back problems began in service. He also notes that he is a Persian Gulf veteran, contending in effect that he has a low back condition that is a qualifying chronic disability for purposes of service connection in Persian Gulf veterans.

During the Veteran’s service, in a May 2003 post-deployment health assessment, the Veteran marked no for back pain presently or during his 2003 deployment. In a November 2004 post-deployment health assessment, he marked no for back pain presently or during his 2004 deployment. In a February 2005 post-deployment health reassessment, he did not report back pain. In a May 2005 medical history, he marked no for history of recurrent back pain or any back problem. In a June 2005 screening of the Veteran, a clinician marked no for any chronic back pain or weakness. In a November 2005 post-deployment health reassessment, the Veteran did not report pack pain. 

In September 2006 the Veteran began to receive medical treatment, including primary care, at a VA facility. At intake he denied any pain. In at least annual treatment visits in 2006 through 2009, and 2016 through 2018, he did not report any back problems.

In the Veteran’s May 2018 claim, he sought service connection for a low back condition manifested by pain and stiffness. 

On VA examination in August 2018, the Veteran reported that his low back had tiredness, stiffness, and pain. He stated that the area was sensitive to pain with bending. On examination, his thoracolumbar spine had some limitation of forward flexion. There was evidence of pain with forward flexion, extension, lateral flexion to each side, and rotation to each side. The examiner concluded that the Veteran had lumbosacral strain. The examiner reviewed the Veteran’s claims file. The examiner expressed the opinion that it is less likely than not that the Veteran’s lumbosacral strain is related to service. In explanation, the examiner found that a May 2003 post-deployment health assessment showed a complaint of back pain. The examiner noted that assessments and screenings later in the Veteran’s service, did not reflect back pain, nor did reports of post-service medical treatment. The examiner expressed the opinion that the Veteran’s current low back condition, lumbosacral strain, is diagnosed and medically explained, so is neither undiagnosed nor part of a medically unexplained chronic multisymptom illness.

In May 2019 private physician Dr. G. reviewed the Veteran’s medical records from during and after service, and completed a nexus statement. Dr. G. indicated that several of the Veteran’s current disorders, including osteoarthritis of the lumbar spine, were caused by the demanding physical nature of his military service. In explanation, Dr. G. noted that the Veteran had pes cavus when he entered service. He stated that pes cavus produces inherent instability, which made the Veteran susceptible to developing arthritis in the course of the strenuous physical demands of military service.

In June 2019 the Veteran wrote that serving with pes cavus, in poorly fitting boots, and in combat placed strain on his low back. He asserted that he reported low back pain in service in 2003 and presently still experienced low back pain.

With regard to problems or symptoms in the Veteran’s low back during service, records compiled during service are often more reliable than recollections made years later. The 2018 VA examiner, Dr. G., and the Veteran all refer to a May 2003 post-deployment assessment showing a complaint of back pain. A May 2003 assessment in the claims file shows a mark of no by back pain. In any case, several medical records from later in his service fail to relate back pain or reflect a report or finding that there was no back pain. Records from service do not indicate that any back pain the Veteran experienced in service continued or recurred through the end of his service. In addition, in VA treatment soon after service, in 2006, the Veteran denied any pain. Later VA treatment records do not reflect any complaints of back pain.

The VA examiner cited specific medical records to explain her conclusion that back disorder symptoms in service did not continue. Dr. G. reviewed medical records but did not cite specific records. He did not discuss whether there are records of back symptoms through the end of service and after. On the question of whether back symptoms in service continued through and after service, the VA examiner’s opinion is persuasive, and is not countered in Dr. G.’s statement. The greater persuasive weight of the evidence is against low back pain in service continuing through service and after service.

The VA examiner diagnosed lumbosacral strain, and Dr. G. listed a diagnosis of lumbar osteoarthritis. The VA examiner’s conclusion that the Veteran’s low back disability is neither undiagnosed nor part of a medically unexplained chronic multisymptom illness is persuasive.

In summary, the preponderance of the evidence is against incurrence in service of chronic low back disorder that continued after service, and against current back disability being a qualifying chronic disability attributable to his Persian Gulf service. The Board denies service connection for his low back disability.

4. Service connection for left knee patellofemoral pain syndrome (claimed as a left knee condition)

The Veteran contends that left knee problems, manifested by cracking and pain, are attributable to his service, including Persian Gulf service.

The Veteran’s service medical records do not reflect any complain or treatment involving either knee. In a May 2005 medical history, he marked no for history of knee trouble. In a June 2005 screening of the Veteran, a clinician marked no for any chronic knee pain or weakness.

After service, in VA treatment in September 2006, the Veteran denied any pain. In treatment in 2007 through 2018, he did not report any knee problems.

In May 2018 he sought service connection for problems in both knees. In May 2019 his wife wrote that she often heard his knees crack. She stated that he wore a knee brace. She expressed the opinion that his activities in combat in service put strain on his knees.

On VA examination in August 2018, the Veteran reported that his knees felt weak, and that they cracked every time he squatted. On examination each knee had limitation of flexion and pain with flexion. Testing did not show instability in either knee. The examiner diagnosed bilateral patellofemoral syndrome. The examiner reviewed the claims file. The examiner expressed the opinion that it is less likely than not that the patellofemoral pain syndrome in each of the Veteran’s knees had onset in service. She noted that service and VA treatment records do not contain reports of symptoms affecting the knees. She expressed the opinion that the patellofemoral syndrome in each knee is diagnosed and medically explained, so is neither undiagnosed nor part of a medically unexplained chronic multisymptom illness.

In May 2019 private physician Dr. G. reviewed the Veteran’s medical records from during and after service, and completed a nexus statement. Dr. G. indicated that several of the Veteran’s current disorders, including osteoarthritis of both knees, were caused by the demanding physical nature of his military service. In explanation, Dr. G. noted that the Veteran had pes cavus when he entered service. He stated that pes cavus produces inherent instability, which made the Veteran susceptible to developing arthritis in the course of the strenuous physical demands of military service.

In June 2019 the Veteran wrote that serving with pes cavus, in poorly fitting boots, and in combat placed strain on his knees. He noted that recently he was diagnosed with patellofemoral pain syndrome in both knees. He asserted that the knee disorders were connected to his pes cavus.

With regard to problems or symptoms in the Veteran’s knees during service, records compiled during service are typically more accurate than much later recollections of that era. The Veteran’s service medical records do not reflect any complaints of knee problems. In VA treatment after service he did not report knee problems. No one who has reviewed the records found any reports of knee symptoms in service, or soon after service. The preponderance of the evidence is against the current knee disorders having had onset in service. There is no medical evidence of arthritis in either knee within a year after service. The VA examiner’s conclusion that the Veteran’s knee disorders are neither undiagnosed nor part of a medically unexplained chronic multisymptom illness is persuasive. The Board denies service connection for his left knee disability.

5. Service connection for left knee patellofemoral pain syndrome (claimed as a right knee condition)

The Veteran contends that right knee problems, manifested by cracking and pain, are attributable to his service, including Persian Gulf service.

The Veteran’s service medical records do not reflect any complain or treatment involving either knee. In a May 2005 medical history, he marked no for history of knee trouble. In a June 2005 screening of the Veteran, a clinician marked no for any chronic knee pain or weakness.

After service, in VA treatment in September 2006, the Veteran denied any pain. In treatment in 2007 through 2018, he did not report any knee problems.

In May 2018 he sought service connection for problems in both knees. In May 2019 his wife wrote that she often heard his knees crack. She stated that he wore a knee brace. She expressed the opinion that his activities in combat in service put strain on his knees.

On VA examination in August 2018, the Veteran reported that his knees felt weak, and that they cracked every time he squatted. On examination each knee had limitation of flexion and pain with flexion. Testing did not show instability in either knee. The examiner diagnosed bilateral patellofemoral syndrome. The examiner reviewed the claims file. The examiner expressed the opinion that it is less likely than not that the patellofemoral pain syndrome in each of the Veteran’s knees had onset in service. She noted that service and VA treatment records do not contain reports of symptoms affecting the knees. She expressed the opinion that the patellofemoral syndrome in each knee is diagnosed and medically explained, so is neither undiagnosed nor part of a medically unexplained chronic multisymptom illness.

In May 2019 private physician Dr. G. reviewed the Veteran’s medical records from during and after service, and completed a nexus statement. Dr. G. indicated that several of the Veteran’s current disorders, including osteoarthritis of both knees, were caused by the demanding physical nature of his military service. In explanation, Dr. G. noted that the Veteran had pes cavus when he entered service. He stated that pes cavus produces inherent instability, which made the Veteran susceptible to developing arthritis in the course of the strenuous physical demands of military service.

In June 2019 the Veteran wrote that serving with pes cavus, in poorly fitting boots, and in combat placed strain on his knees. He noted that recently he was diagnosed with patellofemoral pain syndrome in both knees. He asserted that the knee disorders were connected to his pes cavus.

With regard to problems or symptoms in the Veteran’s knees during service, records compiled during service are often more accurate than much later recollections of that era. The Veteran’s service medical records do not reflect any complaints of knee problems. In VA treatment after service he did not report knee problems. No one who has reviewed the records found any reports of knee symptoms in service, or soon after service. The preponderance of the evidence is against the current knee disorders having had onset in service. There is no medical evidence of arthritis in either knee within a year after service. The VA examiner’s conclusion that the Veteran’s knee disorders are neither undiagnosed nor part of a medically unexplained chronic multisymptom illness is persuasive. The Board denies service connection for his right knee disability.

REASONS FOR REMAND

1. Service connection for pes cavus

The Board is remanding this issue for a VA medical opinion. The Veteran contends that pes cavus, which existed before he entered service, was aggravated in service.

The Court has noted that VA is obliged to provide an examination or obtain a medical opinion in a claim for service connection when the record contains competent evidence that the claimant has a current disability or signs and symptoms of a current disability, the record indicates that the disability or signs and symptoms of disability may be associated with active service, and the record does not contain sufficient information to mark a decision on the claim. 38 C.F.R. § 3.159(c)(4); McLendon v. Nicholson, 20 Vet. App. 79 (2006). 

On examination of the Veteran in June 2001 for entry to service, the examiner found that he had mild, asymptomatic pes cavus. In the Veteran’s May 2018 claim, he contended that his pes cavus was aggravated in service. In an August 2018 rating decision, the RO denied service connection for pes cavus. The failure to provide an examination was a pre-decisional error. The Board is remanding the issue for the RO to provide a VA examination of his feet, with file review and opinion as to the likelihood that his pes cavus was aggravated in service.

The matter is REMANDED for the following action:

1. Obtain a VA medical opinion as to whether pes cavus noted on the Veteran’s entry to service was aggravated in service. Provide the claims file to an appropriate clinician. Ask the clinician to review the claims file and provide opinions addressing the following questions: (A) Did the Veteran’s pes cavus increase in severity during his service? (B) Was any increase in severity limited to the natural progress of the pes cavus condition? Ask the reviewer to explain the conclusions and opinions. Due consideration should be made of the Veteran’s lay statements regarding inservice and post-service foot problems.

 

 

K. PARAKKAL

Veterans Law Judge

Board of Veterans’ Appeals

Attorney for the Board K. J. Kunz, Counsel

The Board’s decision in this case is binding only with respect to the instant matter decided. This decision is not precedential and does not establish VA policies or interpretations of general applicability. 38 C.F.R. § 20.1303.